**Christopher A. Gilmore**, OSB No. 98057
Senior Assistant County Counsel
chris_gilmore@co.washington.or.us
Office of Washington County Counsel
155 N. First Ave., Suite 340 – MS 24
Hillsboro, OR 97124-3072
Phone (503) 846-8747
Fax (503) 846-8636
Attorney for Defendants
**William G. Blair**, OSB No. 69021
William G. Blair, PC
Bill@BlairLawOregon.com
PO Box 5476
Beaverton OR 97007
Phone (503) 608-7222
Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **LEONARD J. SALANITRO**, | No. 03:11-CV-1051-SI |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTIONS IN LIMINE** |
| **PATRICK ALTIERE**, *et al.*, | |
| Defendants. | |

Defendants move the Court before trial and selection of jury as follows; and,

further, that the Court direct plaintiff's attorney to instruct, warn, and caution his client

and each one of his witnesses, to strictly follow the ruling of the Court on these Motions *in Limine*.

**1.** EXCLUSION OF EVIDENCE AND TESTIMONY FROM PLAINTIFF'S EXPERT, MICHAEL LYMAN, THAT DEFENDANTS SHOULD HAVE EXHAUSTED ALTERNATIVES SHORT OF DEADLY FORCE.

The expert report of Michael D. Lyman does not specifically evaluate the use of less lethal alternatives and, as a result, he should be precluded from testifying on that issue at trial pursuant to Fed. R/ Civ. P. 26(a)(2)(B)(i) (must disclose all opinions) and *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Failure to disclose bars any discussion of opinions by that expert that are outside the scope of the report. FRCP 37(c)(1).

It is also clearly established that a police officer is entitled to use deadly force in self-defense. The standard by which an officer's decision to use force must be measured is grounded in the facts known to him at the time in the context of a rapidly evolving and fast-moving sequence of events, not with the benefit of 20/20 hindsight. *Graham v Connor*, 490 US 386, 397 (1989).

A police officer is not required to retreat from a threat, nor is he required to exhaust all possible alternatives to deadly force in the split-seconds where such decisions must be made. *Reed v. Hoy* (9th Cir. 1989) 891 F.2d 1421, 1428 *cert. den*. 501 U.S. 1250 (1991); *Ford v.Childers* (7th Cir. 1988) 855 F.2d 1271, 1276. In *Plakas v. Drinski* (7th Cir. 1994) 19 F3d 1143, 1148 the court noted:

> There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. There are, however, cases

which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first. [Citing *Ford v. Childers, supra*, and *Carter v. Buscher* (7th Cir. 1992) 973 F2d 1328] * * * These cases make it clear that liability cannot be founded on the failure of [Officer] Drinski to keep some sort of distance or natural barrier between himself and Plakas.

A policeman, unlike a private citizen, has no duty to retreat from an affray and stand idly by to be beaten up with the attendant risk that his assailant will grab his weapon and kill him with it. *United States v. Thomas*, 11 M.J. 315, 317 (CMA, 1981).

Because the standard in a use of force case is reasonableness rather than whether the situation in hindsight should have been handled differently using feasible alternatives, any testimony regarding the use of other less lethal weapons must be excluded.

### 2. EXCLUSION OF ANY DISCUSSION BY PLAINTIFF'S USE OF FORCE EXPERT, MICHAEL LYMAN, OF THE CONTINUED CUSTODY OF PLAINTIFF.

Defendants admit liability as to the false imprisonment claim against Washington County. Mr. Lyman's report includes discussion of whether plaintiff was improperly placed in custody:

"My concern for the seizure of Salanitro extends beyond the scene of the shooting and to his lengthy and ***improper custody*** while in the hospital. For example, the record shows that Salanitro was in the hospital for six days and the first 2 ½ days he was handcuffed to the hospital bed and guarded by a deputy." Lyman Report, p.20.

"Not only was Mr. Salanitro clearly in ***custody for 2 ½ days*** when admitted to the hospital, but there is no reasonable evidence that he ever committed a crime. Salanitro was never charged with a crime and because he was shackled to the bed for 2 ½ days and forbidden from contacting his attorney or even watching television, the seizure of his person extended beyond arrest and ***was more consistent with being wrongfully imprisoned***." Lyman Report, p.20.

*"It is my opinion, stated within a reasonable degree of professional certainty, that the seizure of Leonard Salanitro by Deputy Wheaton and the **continued custody of***

*him by members of the Washington County Sheriff's Office was improper,*
*unreasonable and served no legitimate law enforcement purpose. The actions of*
*the officers making Mr. Salanitro's physical seizure were inconsistent with*
*nationally recognized training protocols and practices and procedures* in
*professional policing."* Lyman Report, p.20.

Given the issue of keeping plaintiff in custody is admitted, Mr. Lyman's testimony on

this subject is no longer helpful to the jury and should be excluded.

### 3.   EXCLUSION OF LEGAL CONCLUSIONS IN EXPERT REPORT OF MICHAEL LYMAN.

The expert witness statement of defense expert Michael Lyman is based on a legal

conclusion that Deputy Altiere's use of force was "unjustified" or "unreasonable."  His

report is liberally seasoned with references to reported case law and the constitution.  In

many places it appears to be more an attempt at a scholarly legal treatise than a helpful

explanation for the jury on how a properly trained police officer should act and react.

Legal conclusions, invade the province of the jury, do nothing more than tell the

jury what result to reach and should be excluded.  An opinion which simply tells the jury

what result to reach does not satisfy the "helpfulness" condition of admissibility under

FRE 702. *United States v. Schatzle*, 901 F2d 252, 257 (2nd Cir 1990); *Peterson v. City of*

*Plymouth*, 60 F3d 469 (8th Cir 1995) (it was an abuse of discretion and reversible error

for the district court to permit a defense 'police practices expert' to testify as to his

opinions of the reasonableness of the defendants' conduct in light of Fourth Amendment

standards.)

Whether the force used in a given case is "objectively reasonable" – *i.e.,* whether

such force meets or exceeds legal/Fourth Amendment standard for liability – is a fact

determination which jurors, after hearing all of the evidence, are in as good a position to make as any expert witness. *Hutchison v. Cutliffe*, 344 F Supp 2d 219, 222 (D ME 2004); *Thompson v. City of Chicago*, 472 F3d 444, 457-458 (7th Cir 2006). Therefore, all opinions, expert or otherwise, phrased or framed in terms of whether defendants' actions met the applicable legal standard are improper and should be excluded.

The following excerpts from Mr. Lyman's report are legal conclusions:

"While it is unfortunate that Altiere was concerned for his safety during the course of the incident, it was ***patently unreasonable*** for him to arbitrarily conclude that Salanitro was a threat." Lyman Report, p.17.

"It was also ***unreasonable*** for Altiere not to verbally announce that he was about to use deadly force, as required under *Tennessee v. Garner."* Lyman Report, p.17.

*"It is my opinion, stated within a reasonable degree of professional certainty that under circumstances known in this case, the use of deadly force by Deputy Altiere against Mr. Salanilro was **excessive, unnecessary and served no objectively reasonable purpose**."*
Lyman Report, p.18.

"Under circumstances known in this case, the physical seizure of Mr. Salanitro was improper, ***unjustified and unreasonable***." Lyman Report, p.18.

"Based on the evidence in this case, it is clear that Mr. Salanitro was improperly seized in a private home for which he had a ***reasonable expectation of privacy***." Lyman Report, p.19.

Mr. Lyman also includes a discussion of the constitutional standards at issue in this case. Lyman Report, p.11-12 (constitutional standards: use of force). The legal standards are clearly within the province of the judge. All of this should be prohibited.

### 4. EXCLUDE NICKNAMES OF DEPUTY ALTIERE AND DEPUTY WHEATON AS EVIDENCE OF CHARACTER.

Prior to September 10, 2010, Deputy Wheaton had apparently been given the nickname "Halo" for reasons that are unclear. Subsequent to September 10, and unrelated to his actions on that date, Deputy Altere began to be referred to by the nickname "Angry Pat." Defendants expect that plaintiff will attempt to elicit testimony that defendants have been so nicknamed by their peers. We believe that there will be no testimony that either deputy was referred to by anyone during or in the aftermath of this incident by these nicknames.

Nicknames in this case are inadmissible on several grounds:

- If offered for any other purpose than to prove that they acted in conformance with some character trait that might be inferred from those nicknames, they are simply irrelevant under FRE 402.

- If offered to show that they did act in conformance with such a character trait, they are inadmissible under FRE 404.

- In any event, they are hearsay – statements in the form of some out of court declarant or declarants bestowing nicknames, offered to prove the truth of the assertions implied in the nicknames.

- Deputy Altiere's nickname was bestowed some time after September 21, 2010, and is irrelevant under FRE 402 on that basis alone.

- Finally, even if some relevance could be found, this evidence is misleading, unfairly prejudicial and confusing, and should be excluded under FRE 403.

Under FRE 404(a)(1) character evidence is not admissible when offered "to prove that on a particular occasion the person acted in accordance with the character or trait." "Character evidence" is a generalized description of a person's disposition or of one's disposition with respect to a general trait, such as honesty, temperance or peacefulness. FRE 404, Adv. Comm. Notes.

It is apparent that plaintiff seeks to impeach or discredit these deputies through character evidence by bring their nicknames into court. This type of impeachment is improper because it attempts to taint the reputation of the deputies, thereby misleading the jury as it relates to the conduct at issue in this case. The rationale behind this rule is that although character evidence almost always has some relevance, there is a high risk that a jury may misuse it. *United States v. Curtin*, 489 F3d 935, 944 (9th Cir.) (character evidence "subtly permits the trier of fact to reward the good man and punish the bad man because of their … characters despite what the evidence … shows actually happened.").

5.    **EXCLUDE ANY TESTIMONY OR REFERENCES TO WHETHER OR NOT LEONARD SALANITRO WAS CHARGED WITH A CRIME.**

Under FRE 403 this court has discretion to exclude confusing, misleading and highly prejudicial evidence. Defendants admit that plaintiff was not charged with a crime before his release from custody on September 24, 2010 for purposes of liability as it relates to the false imprisonment claim. However, defendants anticipate that plaintiff will also argue that the failure to charge him with a crime is evidence that he did not attack Deputy Altiere. Reference to the failure to charge plaintiff with a crime for that purpose

is unfairly prejudicial, will tend to confuse and mislead the jury, and result in undue delay in completing the trial.  FRE 403.

Whether plaintiff was charged is a discretionary decision by the District Attorney. If required to meet this issue through testimony at trial, defendants will call Francis "Rob" Bletko, the Chief Deputy District Attorney in charge of this case for the Washington County District Attorney's Office.  The gist of his testimony will be that while he did not doubt that there was probable cause to arrest plaintiff, Mr. Salanitro was not charged or indicted based on other factors within his discretion – primarily his conclusion that without evidence that plaintiff knew that he was attacking a law enforcement officer, he could not prove either Assaulting a Public Safety Officer or Interfering With a Police Officer beyond a reasonable doubt.  Allowing evidence that plaintiff was not charged and the resulting evidence explaining why that decision was not based on lack of probable cause will needlessly prolong the trial.  FRE 403.

### 6. EXCLUDE TESTIMONY AND EVIDENCE ABOUT JAYME FORTUNE'S DRUG AND ALCOHOL ABUSE OR WHETHER HE LIES AND STEALS.

Plaintiff's intends to ask Leonard Salanitro, Dale Fortune, Sue Anne Fortune and Melody Souther to testify about Jayme Fortune's drug and alcohol abuse and that he lies and steals for the purpose of demonstrating that Jayme Fortune's testimony "cannot be trusted."  This type of character evidence is not admissible pursuant to FRE 404, except as permitted under FRE 608 (character for untruthfulness).

Even assuming Jayme Fortune may testify about his use of drugs and alcohol to the extent that he was under the influence of such substances during the September 21,

2010 incident and his phone conversation with his father from the jail. Such evidence is not character evidence but is relevant to the sole purpose of proving his capacity to perceive, recall and relate otherwise relevant fact testimony. Whether or not he does so, any other testimony about his drug and alcohol abuse and that he lies and steals should be excluded under FRE 403 and 404 except the limited testimony permitted as to character for untruthfulness under FRE 608(a).

**7.** EXCLUDE TESTIMONY ABOUT OFFICER COULSON'S INTERVIEWS WITH OTHER PEOPLE.

Plaintiff intends to call Dan Coulson with the Beaverton Police Department to discuss "direct interviews of the persons involved in the shooting of Mr. Salanitro." To the extent those interviews are of persons who are not parties they are inadmissible hearsay under FRE 802.

**8.** EXCLUDE TESTIMONY OF YONSOO LEE AND REGARDING THE AFFIDAVIT HE PREPARED IN SUPPORT OF OBTAINING A SEARCH WARRANT TO SEARCH THE FORTUNE RESIDENCE.

In the immediate aftermath of the incident at issue here, WCSO Deputy Yonsoo Lee prepared and filed an affidavit in support of a search warrant for the Fortune house. The evidence will be that he spoke with neither Deputy Altiere nor Deputy Wheaton in preparing that affidavit. The information contained in the affidavit was obtained from other sources. The affidavit itself is hearsay, and the information contained therein is hearsay with hearsay, thus inadmissible under FRE 802.

**9.	EXCLUDE TESTIMONY OF WILLIAM EMOND REGARDING THE AFFIDAVIT HE PREPARED IN SUPPORT OF THE ARREST OF DALE FORTUNE.**

In the immediate aftermath of the incident at issue here, WCSO Deputy William Emond prepared and filed an affidavit in support of the arrest of Dale Fortune. The evidence will be that he spoke with neither Deputy Altiere nor Deputy Wheaton in preparing that affidavit. The information contained in the affidavit was obtained from other sources. The affidavit itself is hearsay, and the information contained therein is hearsay with hearsay, thus inadmissible under FRE 802.

**10.	EXCLUDE TESTIMONY FROM ONE OF THE TWO WITNESSES FROM TUALATIN VALLEY FIRE AND RESCUE.**

Plaintiff includes the testimony of 2 employees from the Tualatin Valley Fire & Rescue (TVF&R) who were treating plaintiff on the scene, and both of them will testify to the same subject. There is no factual dispute that plaintiff was shot and treated by these paramedics. There is no factual dispute that while they treated him he was in handcuffs. There is no dispute as to the nature and extent of his injuries, or that he experienced pain as a result of those injuries. Unless plaintiff can represent how and where their testimony will be different, one from the other, the testimony of both is cumulative and unnecessary under FRE 403. Plaintiff should be limited to calling one employee of TVF&R.

**11.	EXCLUDE TESTIMONY FROM TWO OF THE THREE EMTS FROM METRO WEST AMBULANCE.**

Plaintiff includes the testimony of three of the Metro West EMTs treating plaintiff on and transporting plaintiff from the scene, all of whom will testify to the same subject.

Testimony as to events during immediate care and treatment given to plaintiff in the house is cumulative to testimony of the TVFR witness. The testimony of more than one EMT concerning events during transport is cumulative and unnecessary under FRE 403 unless plaintiff can represent how and where their testimony will be different, one from the other. See discussion above under motion 9. Plaintiff should be limited to calling one EMT.

### 12. EXCLUDE TESTIMONY OF SHERIFF GARRETT.

Plaintiff intends to call Sheriff Pat Garrett to testify about polices of Washington County, his knowledge of the major crimes team investigation and whether the deputies followed county policy in the use of force. There are thus only three subjects of his testimony. Sheriff Garrett has no personal knowledge of the incident.

With regard to county policies on use of force, the evidence is undisputed that the Washington County Sheriff on September 21, 2010 was Rob Gordon. It is likewise undisputed that the policies then in effect were those promulgated by Sheriff Gordon. Further, plaintiff noticed a Rule 31(b)(6) deposition of the person most knowledgeable about the policies now described in plaintiff's witness statement for Sheriff Garrett. In response defendants produced WCSO Lt. John Black. Lt. Black was accepted by plaintiff under his notice, and deposed. Lt. Black will be a witness called on behalf of defendants. Sheriff Garrett's testimony on policies of his predecessor in office, especially in light of the available testimony of the most knowledgeable WCSO witness on that subject, would be hearsay (FRE 802), cumulative and potentially confusing and misleading causing unnecessary delay (FRE 403).

With the exception of scene diagrams, photos and videotapes, and results of laboratory analyses, the major crimes team investigation consists of detective interviews by of other people who are witnesses to the incident. Testimony by Sheriff Garrett concerning that investigation is hearsay upon hearsay. FRE 802.

Sheriff Garrett has not been designated as an expert witness by either party. Thus, his opinions on the conduct of defendants Altiere and Wheaton is inadmissible. There is no *Monell* claim of ratification in this case. There is no issue as to whether defendants were acting in the course and scope of duty under the Oregon Tort Claims Act, and thus Washington County is vicariously liable for their acts. ORS 30.265(1). Moreover any testimony on whether the shooting was justified under county policy which restates the legal standard that is the ultimate question at issue in this case is a legal conclusion that is within the province of the jury. See argument above.

**13. EXCLUDE EXPERT AND LAY OPINION OFFERED OR FRAMED IN A MANNER COMMENTING UPON OR BOLSTERING THE CREDIBILITY OF ANOTHER WITNESS.**

As stated by plaintiff, witnesses are not permitted to testify specifically about another witness's credibility (other than character for untruthfulness under the limited exception of FRE 608) or to testify in such a manner as to "improperly buttress" a witness's credibility. Because credibility is an issue for jury, even psychiatric experts may not testify specifically as to credibility or buttress credibility improperly *See, e.g., United States v. Binder*, 769 F2d 595, 602 (9th Cir 1985)*, overruled on other grounds, U.S. v. Morales*, 108 F3d 1031, 1035 n. 1 (9th Cir 1997); *United States v. Awkard*, 597 F2d 667, 671 (9th Cir 1979). The fallibility of human perception is generally considered

to be within the knowledge of the average juror. *United States v. Christopher*, 833 F2d 1296, 1299-1300 (9th Cir 1987) (affirming exclusion of expert testimony regarding fallibility of eye witnesses).

The expert report of Michael Lyman is replete with examples.  In fact the entire Section IV of his report is directed at witness credibility and should be excluded in its entirety.  This section states:

> "Another concern in this case is evidence that ***statements made by Wheaton are incorrect, inaccurate or otherwise untrue***. This is concerning because law enforcement officers ***are trained observers sworn to uphold the truth***. If statements made by Dale Fortune are to be believed then the failure on the part of Wheaton and Altiere to be candid and forthcoming about what occurred in this incident then the failure to do so is an egregious breach of professional policing protocol.
>
> The significance of an officer being untruthful is supported by Washington County General Conduct Policy #207-R03 (06-24-08), which states:
>
>> " .... ***staff must not lie***, giving misleading information, or falsely written, verbal or electronic communications in official reports or in their actions with another person or organization. Staff will impart the whole truth when giving testimony or rendering an official report.""

What follows is evidence attempting to cast Deputy Wheaton as a liar.  Mr. Lyman concludes:

> "The discrepancies of Wheaton's and Altiere's accounts of the incident and that told by Dale Fortune are instructive in that, they ***suggest a pattern of dishonesty and a willingness on the part of the officers to spin the truth***."  Lyman Report, p.22.

This is all impermissible evidence regarding the character and truthfulness of the witness and should be excluded.  This opinion testimony is unprofessional and degrades the

decorum in the courtroom resorting to a trial of finger pointing and accusations

amounting to nothing more than "liar, liar, pants on fire."

**14.** **EXCLUDE ANY TESTIMONY OR EVIDENCE ABOUT DEPUTY ALTIERE'S PERSONAL LIFE INCLUDING HIS DIVORCE THAT POST-DATES THE INCIDENT.**

Exclude any personal family information about Deputy Altiere including his

divorce which post-dates the incident and is not related to the conduct of Deputy Altiere

at the time of the plaintiff was shot. All such information is not relevant under FRE 402

and is unfairly prejudicial under FRE 403.

**15.** **EXCLUDE ANY TESTIMONY OR EVIDENCE ABOUT PRIOR COMPLAINTS OF EITHER DEPUTY WHEATON OR DEPUTY ALTIERE INVOLVING USE OF FORCE OR UNLAWFUL ENTRY.**

Defendants anticipate that plaintiff will offer prior complaints involving use of

force or unlawful entry. These prior acts provide no purpose other than to impeach the

officers' character or to show that they acted in conformity with that prior conduct. This

type of evidence is exactly what FRE 404 is intended to exclude and is not admissible

under FRE 404(b). *Sibrian v. City of L.A.*, 288 Fed.Appx. 385, 387 (9th Cir. 2008)

**16.** **EXCLUDE PSYCHOLOGICAL OR EMOTIONAL TRAUMA RELATING TO THE INCIDENT FOR WITNESSES OTHER THAN PLAINTIFF.**

In this case there are six eye witnesses who were involved in the physical struggle

and were present when plaintiff was shot. All or some of those witnesses may have

experienced trauma relating to the shooting. Defendants ask that any non-physical

injuries relating to the incident, including but not limited to any psychological or

emotional trauma experienced by any witness other than the plaintiff, be excluded as irrelevant and unfairly prejudicial under FRE 402 and 403.

17. EXCLUDE ANY TESTIMONY FROM BRENT SCARBOROUGH RELATING TO HIS DIAGNOSIS AND TREATMENT OF PLAINTIFF FOR POST-TRAUMATIC STRESS DISORDER OR ANY OTHER MENTAL ILLNESS.

Plaintiff has listed Brent Scarborough as a witness. Plaintiff's witness list indicates that "[h]e will explain his diagnosis and prognosis for Mr. Salanitro relating to this traumatic incident." Plaintiff's Witness Statement, p. 24. No expert report was ever provided as required by FRCP 26(a)(2).

On January 20, 2012, defendants served a Request for Production of Documents on plaintiff seeking, *inter alia*,

"16. If not already produced in response to the previous requests, please produce all documents including but not limited to e-mail, reports, chart notes, test results, and other records relating to the diagnosis, treatment and prognosis for any and all mental or emotional harm or injuries and damage claimed to have been suffered by plaintiff as a result of the incident."

Even assuming Mr. Scarborough is an "unretained expert" exempt from providing a report, he should nonetheless be excluded from testifying because plaintiff failed to produce his records and chart notes. Pursuant to Fed. R. Civ. P 37(c)(1) failure to disclose documents prohibits a party from using that information at trial.

Plaintiff's Exhibit 105 includes the notes and contract between plaintiff and Brent Scarborough. These documents were never produced. Defendants had no opportunity to depose Mr. Scarborough, to request admissions, interrogatories or to request other documents relating to this evidence. To allow this testimony and evidence is extremely prejudicial because for the first time plaintiff asserts that he has been diagnosed with

post-traumatic stress (PTSD). Defendants had no opportunity to depose plaintiff on this issue. We also note that the agreement between plaintiff and Mr. Scarbrough includes an agreement by plaintiff that Mr. Scarbrough will not be called as a witness in any lawsuit arising out of the shooting incident.

Finally, Brent Scarborough is an intern with a professional psychologist. Because as an unretained expert he has not provided his qualifications, it is unclear whether he is qualified to provide a diagnosis of PTSD himself. Defendants object to him testifying as an expert at trial to the extent he is not qualified to make a diagnosis. Under California, governing his practice, no person may engage in the practice of psychology including a diagnosis without a license. Cal. BPC Code § 2903.

18. EXCLUDE TESTIMONY AND EVIDENCE OF PLAINTIFFS CLAIM OF POST-TRAUMATIC STRESS DISORDER.

Consistent with the arguments presented above, plaintiff failed to disclose key evidence of Mr. Salanitro's PTSD diagnosis until the exchange of exhibits. In addition to Brent Scarborough being excluded plaintiff should be prohibited from testifying about this diagnosis because it is hearsay and was not properly disclosed either in interrogatories, requests for production or plaintiff's deposition.

**19. INCLUDE TESTIMONY AND EVIDENCE OF CRIMINAL CONVICTIONS OF DALE AND SUE ANNE FORTUNE.**

In this case both Dale and Sun Anne Fortune were convicted criminally of charges relating to their conduct on the evening of September 21, 2010. Dale Fortune was convicted of Criminal Mischief, Resisting Arrest and Attempted Assault on a Public

Safety Officer.  Sue Anne Fortune entered a guilty plea to the crime of Interfering With A Police Officr.

    (a)    <u>Criminal convictions of Dale Fortune are admissible under FRE 404(b) for a purpose other than to prove character</u>.

Under FRE 402 relevant evidence is admissible.  Criminal convictions are excluded under specific circumstances as provided under FRE 404 and 609.  Those circumstances do not apply in this case because both FRE 404 and 609 concern prior criminal convictions.  In this case the convictions at issue are for the very conduct that is at issue in this civil proceeding and is not a prior conviction.

Even assuming FRE 404 applies, FRE 404(b) is the inclusionary rule that allows prior convictions "if it is relevant to any material issue other than character." *Huddleston v. United States*, 485 US 681, 687 (1988) and *Boyd v. City & County of San Francisco*, 576 F.3d 938, 947 (9th Cir. 2009).  In the Ninth Circuit, a four-part test is used to determine the admissibility of evidence pursuant to Rule 404(b):  Such evidence may be admitted if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged. *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002).

Here the prior conviction tends to prove a material fact about whether Dale Fortune was resisting arrest and assaulting the police on the evening of September 21, 2010.  This is particularly relevant given that plaintiff's provocation claim goes directly to the issue of whether the officers escalated an otherwise routine investigation.  It is not

at all remote in time and tends to prove that Dale Fortune was resisting arrest and assaulting the police. The commotion that awakened plaintiff was provoked not by deputies Altiere and Wheaton, but by Dale Fortune.

The Ninth Circuit has allowed prior criminal convictions to provide evidence for an issue other than character in an excessive force case. *States v. McCourt*, 925 F2d 1229, 1231-35 (9th Cir. 1991) (prior child abuse conviction allowed to show injuries in excessive force may have been related to child abuse). Here conviction goes directly to the issue of conduct because the same facts are in issue.

In addition to being relevant for purposes of proving the conduct of Dale Fortune on the night of the incident, this evidence is also relevant under FRE 404(b) (2) to demonstrate motive or bias against Defendants. In his deposition Dale Fortune indicated he felt the police were lying and inferred that the judge was in on it:

246
8      A.    Maybe they're making this up to cover their ass.
9   Maybe they know -- and I can only speculate -- maybe they know
10   that they handled this whole thing -- situation -- they
11   escalated it and we didn't cooperate, so they just went
12   overboard.  And somebody got beaten up and somebody got shot,
13   and so they made this up to try to cover their butt.
14      Q.    What do you believe?
15      A.    I believe they are trying to cover their ass.
16   They made a lot of stuff up to try to make it sound like my
17   wife and I are criminals.  My wife weighs 105 pounds.  She's
18   5'3".  And they took her DNA.  They're trying to make it sound
19   like she attacked them like she is some wild cat, cussing and
20   yelling at them.
21      Q.    Were you upset about the criminal convictions?
22      A.    I was very disappointed in the justice system.
23   Because I had an attorney who convinced me that I should go
24   before a judge.  I did not want a jury because juries will
25   always side with police officers, even though my attorney

1 convinced me that he knew these cops were lying, that I should
2 go before a judge, I had a really good chance because there is
3 so much discrepancies in their reports -- one officer saying
4 he grabbed me and I pulled him in; the other officer saying
5 they both -- one had ahold of this arm, the other had ahold of
6 that arm and I pulled them both in.
7      You know, these are trained officers.  I mean,
8 when I deliver packages at UPS, I'm trained to do a job.  I
9 don't make mistakes.  How can these guys, you know, come up
10 with two different stories of something so simple that
11 happened?  And, yeah, I was very disappointed in the justice
12 system.  I felt like we totally got abused.  And in my opinion
13 it worked out the way it did so that we would look like
14 criminals.
15   Q.   So you think the judge was in on it?
16   A.   I don't know.  Personally I like to believe that
17 judges are non-biased and fair.  But somehow -- I mean, she
18 sat right in her courtroom and said, "Well, Mr. Fortune, even
19 though there's discrepancies in these police officers'
20 stories," she goes, "I believe them more than I believe you,
21 and I think you are lying.  You are guilty of all three
22 charges."
23   Q.   And why do you think she did that?
24   A.   I don't know.  Seriously, I don't know.  You know,
25 we are not supposed to have judges and D.A.s that are

1 dishonest.  I know it happens.  My uncle was a cop for 45
2 years.  My wife's father was an Orange County Sheriff for many
3 years.  I have heard the backroom stories.  Go on the
4 Internet, type in "Do police officers lie?"  You know, all
5 those stories on the Internet are not false.  There's some of
6 them there's a lot of credibility to, and it's showing up more
7 and more and more over a period of time now how police
8 officers abuse their power.  And I think that's what happened
9 that night they came to our house.  They abused their power.

Decllaration of Christopher Gilmore, ¶ ___, Exhibit 1, Deposition of Dale Fortune. p. ___

of ___.  Clearly Dale Fortune is angry about his convictions and blames the deputies.

This could significantly influence his testimony at trial and defendants should be provided an opportunity to explore this issue on cross-examination.

> (b) <u>Sue Anne's plea of guilty and the subsequent conviction is admissible because it is not excluded under FRE 410</u>.

FRE 410 prohibits evidence of a plea in a civil case against the defendant. Sue Anne Fortune is not the defendant in this case. Her plea and conviction are admissible for the same reasons discussed above. This evidence is relevant to her conduct on the evening of September 21, 2010 and for purposes of exploring motive or bias against Washington County. It is a material issue dealing with the facts at issue, especially plaintiff's "provocation" theory, and goes to the question of whether the officers escalated the situation or Sue Anne Fortune was in fact interfering with the arrest of her husband.

> (c) <u>Reference to criminal transcript as a prior inconsistent statement is expressly permitted under FRE 801(d)(1)</u>.

Under FRE 801(d)(1) a witness may be impeached with a prior inconsistent statement that was given under penalty of perjury at a trial. Reference to the criminal trial transcript of Dale Fortune is permissible impeachment under this rule for any witness who testifies inconsistent with their statements made during that prior criminal proceeding.

> **20. PERMIT LIMITED EXAMINATION OR CROSS-EXAMINATION OF PLAINTIFF AND HIS ATTORNEY, MICHAEL WISE CONCERNING THEIR INTERVIEWS BY OFFICER COULSON AND THE EXCHANGE OF E-MAILS BETWEEN MR. WISE AND OFFICER COULSON; AND PERMIT OFFICER COULSON TO TESTIFY CONCERNING HIS INTERVIEW WITH MR. WISE AS A PRIOR INCONSISTENT STATEMENT OF PLAINTIFF.**

Mr. Wise is plaintiff's attorney and was so retained on October 8, 2010 when he had a conversation with Officer Daniel "Doc" Coulson, who he knew to be a detective investigating the events at the Fortune home on September 21, 2010. Mr. Wise also knew that his client had twice been interviewed by Officer Coulson while in Emanuel Hospital following his surgery.

During Officer Coulson's second interview of plaintiff, plaintiff invoked his right to have an attorney present during questioning. Officer Coulson terminated the interview and thereafter was told by Mr. Wise that his client declined to be interviewed further, but that he (Wise) would give Coulson a statement on behalf of his client. He did so in an October 8, 2010 interview. Officer Coulson put his notes and recollections of that statement into writing and e-mailed it to Mr. Wise for confirmation. Mr. Wise responded with a marked up version that conflicted with what Coulson recalled of Wise's earlier statement.

At plaintiff's deposition, he refused to answer questions about the substance or authorization of either e-mail on advice of counsel that his answers would invade attorney-client privilege. Mr. Wise likewise refused to comment on his participation in the interview and e-mail exchange.

We expect that Mr. Wise assert attorney-client privilege, both as to his testimony if called as a witness, and as to questions posed to his client about the subject. We also expect that Mr. Wise would, if asked under oath, acknowledge that when he was interviewed by Officer Coulson he knew and understood that Officer Coulson was investigating the incident and that Officer Coulson was interviewing Mr. Wise as the

surrogate for his client in lieu of conducting another personal interview of Mr. Salanitro. We further expect that Mr. Wise would testify that he understood that his mark-up of Officer Coulson's e-mailed narrative was likewise offered as a surrogate for his client and would be relied on by Officer Coulson as such.

The interview, if correctly reported by Officer Coulson in his e-mail to Mr. Wise, and Mr. Wise's reply changing facts in the report, amount to inconsistent statements. If Mr. Wise's statements during the interview were, in fact, correctly reported as facts told him by his client, and his mark-up of the report changing facts therein were likewise provided or authorized by his client, then the e-mail markup amounts to a prior inconsistent statement from Leonard Salanitro.

Among the facts reported as having been conveyed by Mr. Wise on behalf of Mr. Salanitro was the fact that Mr. Salanitro entered the living room of the Fortune house from the dining room, through the French doors. In Mr. Wise's marked-up version of that report, he deleted reference to entering the living room and altered the statement to say that Mr. Salanitro stayed in the dining room.

The Federal Rules of Evidence do not provide an express attorney-client privilege, but do provide rules for determining whether a waiver has occurred. FRE 502. This was an intentional disclosure if Mr. Salanitro knew that Mr. Wise would be providing statements on his behalf in an interview with detectives investigating the shooting incident, disclosed and undisclosed communications by Mr. Salanitro to Mr. Wise covered the same subject matter, they ought, in fairness, to be considered together, and it

would constitute a waiver under Oregon law. FRE 502 (a) and (c). All of those factors apparently apply here.

Even considering Mr. Wise's statements to be an inadvertent disclosure, the privilege is waived if Mr. Salanitro did not take reasonable steps to prevent the disclosure, and the inadvertent disclosure would constitute a waiver under Oregon law. FRE 502(b) and (c). If Mr. Salanitro knew that Mr. Wise would be providing a statement on his behalf and relied on Mr. Wise to protect the privilege, we can imagine no more reasonable steps he could take to protect his communications with Mr. Wise.

Defendants have been prevented from confirming what appear to be the facts surrounding Mr. Wise's communications to Officer Coulson by Mr. Salanitro's refusal to testify, and therefore request a FRE 104 hearing in which these foundational facts can be established.

If the facts are as we understand them, and as supported by testimony at the Rule 104 hearing, Officer Coulson should be permitted to testify as to the substance of his interview with Mr. Wise, as that interview would amount to a prior inconsistent statement of plaintiff.

**21.    NO MENTION OF INDEMNIFICATION OF EITHER OFFICER BY THEIR EMPLOYERS.**

Plaintiff's counsel should be prohibited from questioning or commenting upon any indemnification of Defendants by their employer. Such evidence is nothing more than the introduction of insurance coverage, which is plainly prohibited under FRE 411. Moreover, the evidence of indemnification could lead the jury to award excessive

damages based upon a belief that the County has "deep pockets" sufficient to cover such award. This type of evidence should be excluded as it is not relevant and is highly prejudicial. FRE 401, 402, 403 and 411.

**22.** **NO EVIDENCE, TESTIMONY, ARGUMENTS OR OPINION THAT THE JURY PLACE ITSELF IN THE POSITION OF PLAINTIFF IN DECIDING ISSUES OF DAMAGES, OR THAT THE JURY USE ITS VERDICT TO SEND A MESSAGE TO DEFENDANT WASHINGTON COUNTY.**

Although there is no case on point in the Ninth Circuit, the "walking in plaintiff's shoes" argument, or as it is sometimes called, the "Golden Rule" argument, has been "universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence." *Granfield v. CSX Transportation, Inc.*, 597 F.3d 474 (1st Cir. 2010); *United States v. Palma*, 473 F3d 899 (8th Cir. 2007); *United States v. Roman*, 492 F3d 803 (7th Cir. 2007); and *Blevens v. Cessna Aircraft Co.* 728 F.2d 1576 (10th Cir. 1984).

**23.** **NO TESTIMONY, EVIDENCE, OPINION, ARGUMENT OR SUGGESTION THAT THE USE OF FORCE STANDARDS, TRAINING, POLICIES OR PRACTICES OF WASHINGTON COUNTY OR THE CITY OF TIGARD ESTABLISH OR EVIDENCE STANDARDS BY WHICH REASONABLENESS UNDER § 1983, INCLUDING QUALIFIED IMMUNITY, IS TO BE MEASURED.**

The use of force standards at issue in this case are established by federal common law. Individual agency policies and procedures do not establish a standard of reasonableness under 42 U.S.C. § 1983. *United States v. Guzman-Padilla*, 573 F3d 865, 890 (9th Cir. 2009), <u>cert. den</u>. 130 S.Ct. 1552 (2010) and 131 S.Ct. 67 (2010) ("It is well settled that the scope of the Fourth Amendment's protections is not to be measured by reference to agency guidelines and other extra-constitutional matter.")

### 24. PLAINTIFF'S REQUEST FOR A JURY VIEW SHOULD BE DENIED.

Plaintiff has requested a jury view. Defendant moves, *in limine*, that there be no jury view of the Fortune residence. The incident subject of this action happened on September 21, 2010, nearly two and one half years before the scheduled date of trial herein. There can be no assurance that the premises remain in the same condition as they were on the night of the incident. The jury view would necessarily take place during the day, and lighting conditions are an important factor in this case.

The scene on the night in question was, soon after the incident, carefully photographed and documented by WCSO forensics technicians, criminalists and CART officers. The CART team prepared a detailed scale drawing. From those efforts, forensics experts and reconstructionists have prepared three-dimensional reconstructions.

No good purpose would be served by transporting the jury from downtown Portland to the community of Aloha for a view of the property as it exists today. It would take a half day of precious trial time.

Respectfully submitted January 25, 2013.


_____*s/ Christopher A. Gilmore*_____
Christopher A. Gilmore, OSB No. 98057
Senior Assistant County Counsel
Of Attorneys for Defendants